IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:06-CR-121 |
| | ) | (Jordan / Shirley) |
| | ) | |
| RODERICK OWENS, | ) | |
| | ) | |
| Defendant. | ) | |

## **REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case came before the Court on July 17, 2007, for an evidentiary hearing on Mr. Owens' Motion to Suppress [Doc. 37]. Defendant Roderick Owens was present in court with his attorney A. Philip Lomonaco. The United States was represented by Assistant United States Attorney Matthew T. Morris. On July 19, 2007, the government filed a post-hearing supplement. The Court took this matter under advisement on July 20, 2007.

### **I: FACTS**

The parties agree that on September 6, 2006 officers arrived at the residence of Phyllis Warfield at Ridgebrook Apartments, number 1, Knoxville, Tennessee. Many of the specific facts after this are disputed, however parties agree that police entered the home of Ms. Warfield, they searched the residence, and they took Mr. Owens into custody. The police transported Mr. Owens to the Knoxville Police Department where he was held in an interrogation room. Mr. Owens was

read his Miranda rights, and he signed a Statement of Rights and Waiver of Rights form. After that point, Mr. Owens made several self-incriminating statements concerning his possession of a shotgun. Mr. Owens now moves to suppress these statements based on the issues below. The Court will address additional facts as they relate to each issue.

## II: ANALYSIS

### A. *Standing*

Mr. Owens argues that his incriminating statements ought to be suppressed because they were obtained as a result of a warrantless home entry in violation of the Fourth Amendment. However, Mr. Owens was not arrested in his home. Mr. Owens was arrested in Ms. Warfield's apartment. The evidence presented at the hearing demonstrated that Ms Warfield was the tenant of Ridgebrook Apartments, unit 1. There was no testimony with regard to Mr. Owens' relationship to the apartment, if any. The Court cannot conclude that Mr. Owens had an expectation of privacy in Ridgebrook Apartments, unit 1. United States v. Sharp, 470 U.S. 675, 682 (1985); Minnesota v. Carter, 525 U.S. 83, 88 (1998); United States v. Williams, 353 F.3d 497, 511 (6th Cir. 2003). Because the Fourth Amendment guarantees only against unreasonable searches and seizures and these rights are personal, the defendant bears the burden of proving that his own Fourth Amendment rights were violated, and that he has "standing," to assert a Fourth Amendment violation. United States v. Salvucci, 448 U.S. 83, 86 (1980); Rakas v. Illinois, 439 U.S. 128, 132 (1978). Accordingly, the Court finds Mr. Owens does not have standing to challenge the search at issue. Should the District Court disagree with this conclusion, this Court will review Mr. Owens' arguments on the issue of consent.

## B. Consent to Search

The Court begins its examination of this issue by noting that "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980). That being said, "[a] search does not violate the Fourth Amendment where police obtain consent to search from one who possesses common authority over the premises . . . ." United States v. Clutter, 914 F.2d 775, 777 (6th Cir. 1990).

An individual's voluntary consent to an officer's entry into or search of his or her home is an exception to the warrant requirement of the Fourth Amendment. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990) (holding that the prohibition against warrantless searches is not applicable "to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises") (citations omitted); Zap v. United States, 328 U.S. 624 (U.S. 1946); Bumper v. North Carolina, 391 U.S. 543 (U.S. 1968). A valid search of a premises may be made without a warrant and without probable cause if the person voluntarily consents to the search. Schneckloth v. Bustamante, 412 U.S. 218, 219, 228-29 (1973); United States v. Van Shutters, 163 F.3d 331, 335 (6th Cir. 1998) (holding that "[i]t is well-established that a warrantless search by law enforcement officials will be upheld if a detainee has voluntarily consented to the search"); Wolfel v. Sanborn, 555 F.2d 583 (6th Cir. 1977) (no valid contest of search where consent is given).

The applicability of this exception is evaluated by examining the totality of the circumstances, with the burden resting on the government to prove both actual consent and its

voluntary nature. United States v. Scott, 578 F.2d 1186, 1188-89 (6th Cir. 1978). The government must make this showing through "clear and positive testimony" and to a preponderance of the evidence. United States v. Worley, 193 F.3d 380, 385 (6th Cir. 1999) (quoting Ohio v. Robinette, 519 U.S. 33, 40 (U.S. 1996)). In particular, the government must show that the consent was "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." United States v. Magana, 70 Fed. Appx. 859, 866 (6th Cir. 2003) (restating the rule of Bumper v. North Carolina, 391 U.S. 543, 548 (U.S. 1968)).

The Supreme Court has enunciated certain factors to consider in this analysis, including the person's age, intellect (including education and mental condition), physical condition, and whether or not the person was in arrest or subject to interrogation, and whether or not he was advised of his right to consent (the latter factor not being required, but a permissive factor for consideration.) Schneckloth, 412 U.S. at 226.

Here, two police investigators came to Ms Warfield's apartment to talk to her about a gun she had pawned at a pawn shop.[1] Police suspected that the gun was linked to an unsolved murder in August 2006. When they arrived, the police asked if they could step inside so that people in the neighborhood would not become curious about the conversation.

Officer Bell testified that his interaction with Ms. Warfield was cordial. He testified that he informed Ms. Warfield that he was involved in a murder investigation, and requested that they move inside to ensure privacy from neighbors. Bell testified that Ms. Warfield agreed, and they entered the livingroom of the home. Officer Bell explained his desire to search the home for items related

---

[1] A uniformed patrol officer was also nearby, generally positioned in a casual manner between the apartment building and his police cruiser. This officer did not interact with the residents in any way consequential to the issue of consent to search.

4

to the murder investigation. Officer Bell testified that Ms. Warfield expressed concern about Officer Bell seeing her home in a messy state. Bell reassured Ms. Warfield that her housekeeping was of no concern. Bell also explained that he could obtain a search warrant, but that Ms. Warfield's cooperation was desirable. Officer Bell testified that Ms. Warfield agreed to the search and signed the waiver. The audio portion of Officer Johnson's cruiser video, stationed nearby, is consistent with Officer Bell's description of the exchange leading to the consent to search.

Phyllis Warfield leased the apartment at Ridgebrook Apartments, unit 1, Knoxville, Tennessee, and she was the person exercising control of that address on the date of the incident. Ms. Warfield clearly had the authority to give consent to search her apartment. This is true for both the apartment generally and the particular room in which Mr. Owens was found. Further, it is well-settled that the Officer Bell statements to the effect that he would obtain a warrant if Ms. Warfield did not consent to the search does not taint her consent. United States v. Salvo, 133 F.3d 943, 954 (6th Cir. 1998); United States v. Blanco, 844 F.2d 344 (6th Cir. 1988).

There was some tension between the testimony of Officer Bell and Marian Leberette. Ms Leberette testified at the hearing that she is Ms Warfield's sister and lived in the apartment at the time of these events. Ms Leberette also signed the consent to search form, in the capacity of a witness to Ms Warfield's consent Ms Leberette testified that Ms. Warfield was concerned about Officer Bell scaring her children by searching their room. Officer Bell testified that he reassured Ms. Warfield of the children's safety and that she then consented to the search. Ms. Leberette testified that she knew Ms. Warfield did not want Officer Bell in the home. However, the Court finds this testimony speculative and insufficient to rebut the proof offered by the government.

Ms. Leberette also testified that she thought the waiver was a search warrant. However, as cosigning witness of the waiver, it is irrelevant what Ms. Leberette thought she was signing, since

5

it is Ms. Warfield's consent that is germane. Regardless, knowledge of the right to refuse, is not a necessary element of a voluntary consent to warrantless search. Ohio v. Robinette, 519 U.S. 33, 39 (U.S. 1996). Again, the Court finds this testimony irrelevant and insufficient to overcome the "clear and positive" testimony offered by Officer Bell.

The government offered "clear and positive" testimony from Officer Bell that consent was given voluntarily by Ms. Warfield. Based on the totality of the circumstances the Court finds by a preponderance of the evidence that Ms. Warfield voluntarily consented to a police search of both the house generally, and the back room where Mr. Owens was found.

### C. Impact of the Search of Phyllis Warfield's Home Upon Incriminating Statements Later Made by Roderick Owens

The government contends that even if there was a Fourth Amendment violation in the search of Ms Warfield's apartment, it does not follow that Mr. Owens' later statements should be suppressed. This issue is controlled by the holding in New York v. Harris, 495 U.S. 14 (U.S. 1990). In Harris, the Supreme Court considered whether the exclusionary rule should apply to an incriminating written statement made by respondent. New York v. Harris, 495 U.S. 14 (U.S. 1990). Although police had probable cause to arrest respondent, he was arrested upon a warrantless and nonconsensual entry into his home. Harris, 495 U.S. at 19. Respondent was then taken to the police station where he made an incriminating written statement after being informed of his Miranda rights. Id. The Supreme Court held that the statement was admissible because the statement did not bear a substantially close relationship to the underlying illegality. Id.

In Harris, the underlying illegality was the arrest of respondent in his home, without a warrant, and without consensual home entry. In the present case, Mr. Owens was not arrested in his home, Officer Bell testified that he had several warrants for Owens' arrest and the Court has already

6

concluded that the search was consensual. Nevertheless, even if the Court assumed the illegality of police entry into Ms. Warfield's home and even the illegality of Mr. Owens' arrest, the real question as explained in Harris, is whether "suppressing the statement taken outside the house would…serve the purpose of the rule that made [Owens'] in-house arrest illegal?" Harris, 495 U.S. at 20.

The Fourth Amendment and exclusionary rule are imposed to protect the home, and any incriminating evidence the police gather by unlawful entry into the home. Suppressing the statements made by Owens after his arrest and outside Ms. Warfield's home would not serve the Fourth Amendment's purpose of protecting citizens from unreasonable searches. "As cases considering the use of unlawfully obtained evidence in criminal trials themselves make clear, it does not follow from the emphasis on the exclusionary rule's deterrent value that anything which deters illegal searches is thereby commanded by the Fourth Amendment." United States v. Leon, 468 U.S. 897, 910 (U.S. 1984). Mr. Owens' statements are not subject to suppression based on the circumstances surrounding his arrest in Ms. Warfield's home.

### *D. Invocation of Right to Counsel*

Mr. Owens next asserts that he requested an attorney during his custody at the police station, but that Officer Bell and the other officers ignored his initial request and proceeded with an interrogation in violation of Miranda and the Fifth Amendment. Mr. Owens argues that the signed waiver obtained by police cannot be a valid waiver of his right to counsel because it was obtained after invocation of his right to counsel.

7

*Officer Chris Bell*

At Ms Warfield's apartment, the officers found Mr. Owens hiding under a child's bed in a back room. Officer Bell testified that they also found another man in a bathroom. Mr. Owens would not confirm his identity to the police, who had outstanding warrants for his arrest (on unrelated matters). Officer Bell testified that he took Mr. Owens to the police station to take his fingerprints and confirm his identity, in addition to questioning him about the pawned gun and the murder. When they arrived at the station, Officer Bell put Mr. Owens in an interview room located adjacent to the open office area of the criminal investigations unit ("the CID office"). Officer Bell described this as a temporary measure because he wanted to interview Mr. Owens in another interview room near the property crimes area. That room was equipped with audio and video recording, but was being used to interview Ms Warfield.

Officer Bell testified that Mr. Owens was alone in the first interview room for quite some time while the interview of Ms Warfield went on. During this time, Officer Bell was preparing for his interview of Mr. Owens by getting information on his criminal history and arranging the fingerprinting. Officer Bell testified that when he checked on Mr. Owens to be sure he was alright, Mr. Owens started talking about the circumstances of his connection with the gun. Officer Bell testified that he stopped Mr. Owens from talking and assured him that he would get a chance to tell his story in awhile. Officer Bell testified that there was no mention of an attorney while Mr. Owens was in the first room.

Officer Bell testified that Mr. Owens was then taken to another area and fingerprinted. When that was complete, Mr. Owens was taken through the CID office to the second interview room where the video equipment was located. But, on the way to the second interview room or in its vicinity, Officer Bell testified that he and another officer were discussing Mr. Owens in hushed

8

voices before the interrogation. Mr. Owens overheard the officers and threatened that "maybe I *should* ask for a lawyer" if they were going to whisper about him.[2] After that exchange, Mr. Owens was first advised that all he had to do was ask for one and he would get one. Officer Bell said he also told Mr. Owens that if he did not want to talk to him he did not have to. Officer Bell testified that after that, Mr. Owens was reassured and was taken to the second interrogation room, equipped for video recording. Officer Bell testified that it was there he advised Mr. Owens of his Miranda rights and the defendant signed a waiver form, agreeing to talk with the officers. Officer Bell testified that Mr. Owens spoke with the officers for a short time, then became agitated and finally asked to speak to a lawyer. When Mr. Owens asked for a lawyer, Officer Bell testified, the officers left the interrogation room and questioning never resumed.

*Testimony of Roderick Owens*

Defendant Owens testified at the suppression hearing as to the circumstances of his interrogation at the Knoxville Police Department. Attorney Lomonaco informed the Court that he had discussed the benefits and detriments of testifying at the suppression hearing with Mr. Owens and that he understood he did not have to testify, and further that it would be in Mr. Owens' best interest to testify. The Court advised Mr. Owens of his right to remain silent and not to testify and Mr. Owens indicated that he understood that right and that he had discussed this matter with his attorney and wished to testify.

---

[2] Officer Bell testified that he was standing near the doorway of an interrogation room speaking to Officer McKnight, who is African-American. Bell testified that he quietly requested the other officer to sit in on the interview with Mr. Owens because he believed that the presence of another African American male would establish a positive climate for the interview.

Mr. Owens testified at the hearing that he refused to give his name to the police officers when they found him inside Ms Warfield's apartment. In response, the officers took him down to the police station for fingerprint identification because they suspected he was wanted on outstanding arrest warrants. Mr. Owens testified that he was taken into a questioning room he was at the police station and asked about the gun. Mr. Owens testified that after about 15 - 20 minutes, he asked if he could telephone a lawyer. Mr. Owens testified that Officer Bell responded by asking if he had a lawyer he wanted to call, to which Owens responded that he did not. He said Officer Bell then told Mr. Owens that "at this time" the police could not get him a lawyer.

Mr. Owens testified that he was then left alone in the room for "quite a while" before anyone returned, then he was taken downstairs to give fingerprints. Mr. Owens testified that after the fingerprints, he was returned to the *same* room as before. Mr. Owens testified that he asked about getting a lawyer again in the corridor outside the interview room, but was ignored. Mr. Owens testified that he waited for a long time in the room after the fingerprinting, but that eventually Officer Bell came back with a form. Mr. Owens testified that he found the form confusing because it seemed to contradict itself, especially as to item # 4, advising of the right to counsel. Mr. Owens said that he thought he could not get a lawyer, but the form seemed to say that he could. Mr. Owens testified that he asked to speak to a lawyer three times while at the police station, twice before the videotaped interview. The first was when he was initially questioned about the gun when he first arrived, next was in the hallway after the fingerprinting. Mr. Owens testified that the request to speak with an attorney, captured on the videotape, was the third time he asked.

On cross-examination, the government established that Mr. Owens has been arrested numerous times in the past, listing five such arrests in 1995. Mr. Owens testified that he has had appointed counsel in past criminal cases and agreed with the statement that he is "no stranger" to

the criminal justice system, although he has not always been advised of his rights when arrested. Mr. Owens also testified that Officer Bell told him that he did not have to talk with Bell.

On redirect examination, Mr. Owens estimated that he was in the interrogation room for about one hour before he was taken to be fingerprinted, then waited in the same room for about one and a half hours before Officer Bell came in to question him.

In addition to his earlier testimony, the government recalled Officer Bell to the stand after Mr. Owens testified. Officer Bell testified that Mr. Owens never indicated he wanted a lawyer while he was in the first interrogation room. He testified that it was "quite some time" after Mr. Owens was placed in the second interrogation room before Officer Bell went in to question him. The reason for this delay was that Bell was waiting for the fingerprint analysis and Mr. Owens criminal history report, but he eventually concluded these were taking too long and went ahead with the interview. At various times before the interview began, Bell checked on Mr. Owens to see if he needed to use the restroom or wanted any water. Officer Bell testified that he checked in on Mr. Owens in this way three times, but did not have any meaningful exchange with Mr. Owens except the first time when Mr. Owens wanted to start talking to Bell about substantive matters.

Officer Bell and Mr. Owens both testified as to their discussion regarding the rights waiver form. Mr. Owens testified that he questioned the line listed as # 4 on the form explaining the right to counsel. Mr. Owens testified that Officer Bell then told him that the police could not go get him a lawyer right then, but that a court could later provide one if he were charged with a crime. Mr. Owens testified that it was then his understanding that he would not get a lawyer. Officer Bell testified initially that when Mr. Owens asked about line # 4 and the part about "an attorney will be appointed to represent you," Bell told him if he was charged an attorney would be appointed, but if he did not want to talk to Bell that was fine, he did not have to, and if he wanted an attorney it was

11

the time to ask for one. The video appears to confirm Officer Bell's testimony, specifically from time marker 21:54:29 through 21:56:40. It appears that Officer Bell advised Mr. Owens that if he were charged, the court would appoint an attorney, and that it is the court who appoints attorneys, not the police. The video further confirms the defendant asked for a lawyer at 22:07:52 and there were no further questions and no interrogation thereafter.

The Court found Officer Bell's testimony credible. On those issues where he and Mr. Owens may disagree as to the actual facts and statements, the Court found Officer Bell's statements to be more credible.

In <u>Miranda</u>, the Supreme Court held that a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins. <u>Miranda v. Arizona</u>, 384 U.S. 436, 469-473 (U.S. 1966). As a corollary to the rule in <u>Miranda</u>, the Supreme Court in <u>Edwards</u> held that a suspect who is in custody and has asked for a lawyer must not be subject to further interrogation until a lawyer has been provided or unless the suspect initiates a discussion. <u>Edwards v. Arizona</u>, 451 U.S. 477 (U.S. 1981).

> [T]he rule of <u>Edwards</u> embodies two independent inquiries. First, courts must determine whether the accused actually invoked his right to counsel. Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.

<u>Van Hook v. Anderson</u>, 488 F.3d 411 (6th Cir. 2007).

A suspect's invocation of the right to counsel must be clear and unambiguous. <u>Davis v. United States</u>, 512 U.S. 452, 459 (U.S. 1994). Whether the accused actually invoked his right to counsel is an objective inquiry. <u>Id.</u> at 458. If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have

12

understood only that the suspect might be invoking the right to counsel, then cessation of questioning is not required. Id.

> The police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation. But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning "would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present.
>
> Davis, 512 U.S. at 458 (citations and internal quotations omitted).

There are two prominent cases, both binding on this Court, where defendants' purported requests for counsel were prefaced by the phrase, "Maybe I should... ." See Davis v. United States, 512 U.S. 452 (1994); Abela v. Martin, 380 F.3d 915, 926 (6th Cir. 2004).

In Davis, the Supreme Court considered defendant's statement, "Maybe I should talk to a lawyer." Davis, 512 U.S. at 455. After Davis made this ambiguous statement, Officers immediately inquired whether he was "asking for a lawyer," or whether he was "just making a comment about a lawyer." Id. The defendant responded, "No, I'm not asking for a lawyer...No, I don't want a lawyer." Id. Ultimately, the court concluded that Davis's statement was ambiguous, and not sufficiently clear such that a reasonable police officer in the circumstances would have understood the statement to be a request for an attorney. Id.

The facts of the present case differ somewhat from those in Davis. In Davis, police immediately attempted to clarify defendant's equivocal statement. Davis did clarify by unambiguously indicating that he was not asking for counsel. Id. In the present case, Officer Bell testified he reassured Owens that officers were not talking behind his back and advised the defendant that he did not have to talk to him, and if he wanted an attorney all he had to do was ask

13

for one and one would be provided. This Court finds the reaction of Officer Bell relevant for two reasons. First, it highlights the conditional element of Owens' statement, "If you all are going to whisper behind my back… ." Officer Bell clearly interpreted Owens' statement as a misunderstanding rather than a request for counsel. Second, it reminds this Court that the Davis court declined to adopt a rule requiring interviewing officers to ask clarifying questions. Davis, 512 U.S. at 461. With its conditional preface, Owens' statement was at least as equivocal or ambiguous as Davis', and so it was reasonable for Officer Bell to make the clarifying statements that he made.

In Abela, where defendant stated, "maybe I should talk to an attorney by the name of William Evans," and where defendant showed a police sergeant the attorney's business card, the Sixth Circuit Court of Appeals held that the surrounding circumstances of Abela's statement were such that a reasonable officer would have understood that he was clearly and unequivocally invoking the right to counsel. Abela v. Martin, 380 F.3d 915, 926 (6th Cir. 2004). The Abela court also held that "language that might be less than clear, when viewed in isolation, can become clear and unambiguous when the immediately surrounding circumstances render them so." Id.

Like Davis, the Abela court mandated consideration of the surrounding circumstances to determine the clarity of a disputed request for counsel. However, the different outcome in Abela is supported by the fact that Abela's request was not equivocal or ambiguous as he specifically named his attorney and provided police with his attorney's business card. In contrast, Mr. Owens' statement conveyed no such clarity or specificity. In light of the surrounding circumstances, Mr. Owens' statement was more in the nature of a conditional threat than an unequivocal request for counsel. Therefore, further questioning of Mr. Owens was not improper, and the rights waiver the officers secured from Mr. Owens was not affected by this vague statement.

14

*E. Voluntary Waiver*

Mr. Owens argues that he never knowingly, voluntarily, and intelligently waived his Fifth Amendment and Miranda rights when law enforcement began the custodial interrogation. The government argues that Mr. Owens did knowingly, voluntarily, and intelligently waive both his right against self-incrimination as well as his right to consult with counsel, as evidenced by his decision to sign the written rights waiver form.

Defendant's waiver of Miranda rights must be found based on the totality of the circumstances. Seymour v. Walker, 224 F.3d 542, 553-554 (6th Cir. 2000) citing Moran v. Burbine, 475 U.S. 412, 421 (U.S. 1986). If an "interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Tague v. Louisiana, 444 U.S. 469, 470 (U.S. 1980) quoting Miranda, 384 U.S. 436 (U.S. 1966). Also, presuming waiver of the right to the assistance of counsel from a silent record is impermissible, Miranda, 384 U.S. at 475. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but made an intelligent and understanding rejection of the offer. Id. Finally, voluntariness must be proven by a preponderance of the evidence. Seymour, 224 F.3d at 553-554 citing Colorado v. Connelly, 479 U.S. 157, 169-71 (U.S. 1986).

The admissibility of any statement given during custodial interrogation of a suspect depends on whether the police provided the suspect with four warnings. Dickerson v. United States, 530 U.S. 428 (U.S. 2000). These warnings (which have come to be known colloquially as "Miranda rights") are: a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney

one will be appointed for him prior to any questioning if he so desires." <u>Dickerson,</u> 530 U.S. at 435 (citing <u>Miranda</u>, 384 U.S. at 479 (U.S. 1966)). The <u>Miranda</u> court said that, "because the government is responsible for establishing the isolated circumstances under which a custodial interrogation takes place and has the only means of making available corroborated evidence of warnings given, during incommunicado interrogation, about the right to the assistance of counsel, it is proper that the burden of demonstrating the waiver of that right rests on the government." <u>Id</u>.

The government offered the courtroom testimony of Officer Bell, the video exhibit, and the signed written waiver to prove that Mr. Owens waived his rights voluntarily. The video exhibit produced by the government shows that before reading the waiver, Officer Bell asked Owens, "Have you ever been read your rights before?" Owens nodded affirmatively and said "umhm." Officer Bell then stated, "You know exactly what they are about?" Owens again responded affirmatively, "umhm." Officer Bell read the entire waiver to Mr. Owens, and Owens reaffirmed that he understood several times. Before Owens' execution of the waiver, Officer Bell and Mr. Owens had the following exchange:

**Bell:** Have you ever been read your rights before?

**Owens:** Umhm [affirmatively]

**Bell:** You know exactly what they're about?

**Owens:** Umhm [affirmatively]

**Bell:** You are not under arrest for the murder investigation I am working on ok? But I'm asking you questions about the shotgun and everything. So, I have to read these to you…and…[unintelligible]…You're signature doesn't give away anything. It just says that investigator Bell read these to you on this date and time and that you understand.

[Bell reads entire section of waiver headed STATEMENT OF YOUR RIGHTS]

**Bell:** Do you understand these five things?

**Owens:** Umhm [affirmatively]

[Bell reads entire section of waiver headed WAIVER OF RIGHTS]

**Bell:** I've not twisted your arm. I've not promised…[unintelligible]

**Bell:** If you understand these, like I said you're signature doesn't give away anything. You can stop talking…[interrupted]

**Owens:** I asked you a question about number four, if you want a lawyer but are unable to pay for one…[interrupted]

**Bell:** If you are charged with something…[interrupted]

**Owens:** Ok

**Bell:** …a lawyer would be appointed to represent you if you didn't have enough money to afford one. If you're charged with a crime, and you go to jail they're gonna ask you if you can afford an attorney. You say no, I can't afford an attorney. They'll appoint an attorney to represent you…it's not actually the police department that gives you an attorney or anything like that. That's a good question. You're signature doesn't say that you are obligated to talk with me. You can stop anytime you want. It just says I read those to you. You read over them too. [passing waiver to Owens]

**Owens:** I understand…[unintelligible]

**Bell:** You do?

**Owens:** Yeah

[Owens signs waiver]

 Mr. Owens asserts that Officer Bell's response to his question about provision four was misleading or coercive. However, the written waiver certainly satisfies every notice requirement under <u>Miranda</u>, and Bell read the entire document asking Owens if he understood several times. In <u>Duckworth</u>, the Supreme Court sanctioned a formulation in which the defendant was told that an attorney would be appointed for him "if and when you go to court." <u>Duckworth v. Eagen</u>, 492 U.S. 195, 204-05 (U.S. 1989). The Court held that this phrasing did not conflict with <u>Miranda</u>. <u>Duckworth</u>, 492 U.S. at 204. The significance of Bell's clarifying statements are minimized by the

fact that he read the waiver verbatim, and clearly the provisions of the waiver satisfy the notice requirements of Miranda. Furthermore, Officer Bell once again advised Mr. Owens that he was not obligated to talk with Bell and could stop anytime he wanted.

Mr. Owens cites the Miranda holding that "the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. Miranda, 384 U.S. at 476. However, the period of interrogation for the defendant in Miranda was a great deal longer than that of Mr. Owens. In Miranda, defendant Westover was arrested and booked two hours later. Miranda, 384 U.S. at 494. Kansas City police interrogated Mr. Westover on the night of his arrest. Miranda, 384 U.S. at 495. The next day, local officers interrogated him again throughout the morning. Id. At noon, FBI investigators continued interrogation for more than two hours and finally obtained a confession. Id. According to the time log displayed in the government's video exhibit, Mr. Owens was taken into custody at approximately 7:30 p.m. According to the time written on the waiver, Owens executed the waiver at 9:54 p.m. The length of interrogation prompting the rule set forth in Miranda, is not comparable to the length of Mr. Owens' interrogation, nor was there any evidence offered that the actual length of time in this case in any way affected Mr. Owens' understanding or the voluntariness of his decision to sign the waiver. Thus, Mr. Owens argument on this point is misplaced.

In a recent 2007 case the Sixth Circuit Court of Appeals emphasized the policy for preserving confessions of guilt and waivers of right:

> The Constitution does not negate society's interest in the ability of police to talk to witnesses and suspects. Both waiver of rights and admission of guilt are consistent with the affirmation of individual responsibility that is a principle of the criminal justice system. Admissions of guilt are more than merely desirable; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law…Courts must not create wholly irrational obstacles to legitimate police investigative activity.

Van Hook v. Anderson, 488 F.3d 411 (6th Cir. 2007) (Internal citations and quotations omitted).

The Court finds the testimony of Officer Bell credible and finds that his testimony is corroborated by the videotape of the police station interview. While the videotape shows that Mr. Owens did ask questions about line # 4 of the Miranda rights waiver form, the Court finds that Mr. Owens did not unequivocally invoke the right to counsel at that time, nor did he do so earlier, and only unequivocally invoked such right at the end of the interview. The manner in which Mr. Owens ultimately did ask for a lawyer does not suggest that this was his third such request, as he alleges, rather it appears to be his last reaction to an increasingly heated police interview, and his response when Officer Bell became confrontational and began to ask for details about his story.

This Court finds that the government produced sufficient proof to establish by a preponderance of the evidence that Mr. Owens voluntarily waived both his right to counsel and his right against self-incrimination before making the statement to Officer Bell. The Court finds that Officer Bell stopped questioning Mr. Owens when he actually made a request for a lawyer. Accordingly, these statements do not offend Miranda or the Fifth Amendment.

# III. CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that defendant Roderick Owens' Motion to Suppress Evidence **[Doc. 37 ]** be **DENIED**.[3]

Respectfully submitted,

  s/ C. Clifford Shirley, Jr.  
United States Magistrate Judge

---

[3] Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).